UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELI BEN-DOR : | |
|     Plaintiff, : | |
| : | CIVIL ACTION NO. |
| v. : | 3:03-CV-1991 (JCH) |
| : | |
| JACOB LORBERT and GBD, INC., : | |
|     Defendants. : | SEPTEMBER 28, 2005 |

**RULING RE: PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT [DKT. NO. 31]**

The plaintiff, and counterclaim defendant, Eli Ben-Dor, initiated this action against defendants Jacob Lorbert and GBD, Inc. ("GBD") in Connecticut Superior Court for a decree dissolving GBD and ordering the parties to wind up its affairs. The defendants properly removed the action to this court under 42 U.S.C. §1332(a)(1) and 42 U.S.C. § 1441(a) and then asserted counterclaims against Ben-Dor for breach of fiduciary duty, misappropriation of corporate assets, unjust enrichment, intentional interference with business relations, fraud, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. §§ 42-100a et seq. Ben-Dor moves for summary judgment on all of the counterclaims against him, arguing that the defendants have not produced evidence to establish essential elements of their claims. For the reasons stated below, Ben-Dor's motion is DENIED.

**I. FACTS**[1]

This lawsuit involves the circumstances pertaining to the end of a business venture, GBD, that is owned by Ben-Dor and Lorbert. In July 2000, Lorbert and Ben-

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving parties, here the defendants, where there is evidence to support their allegations.

Dor formed GBD, a Connecticut corporation in which they each owned 50% of the stock.  GBD was involved in the business of constructing "turn-key" medical imaging facilities at hospitals and other sites, as well as other construction projects.

At the time of incorporation, Lorbert was designated the vice-president, treasurer, and secretary of the corporation, Ben-Dor its president, and both men were named as directors.  Motion for Summary Judgment, Exs. 1 and 4 [Dkt. No. 35].  According to Lorbert, GBD held an annual meeting by telephone in which Ben-Dor informed Lorbert he was changing the information on file with the Secretary of State of Connecticut to list Lorbert as the director and treasurer of GBD, and Ben-Dor solely as the president.  Answer and Affirmative Defenses by Lorbert [Dkt No. 10], ¶ 5.  Lorbert claims that this change constituted an agreement by Lorbert and Ben-Dor that Lorbert would be the sole director of GBD.  Id. at 8.  Ben-Dor disputes that there was an agreement to make Lorbert the sole director of GBD and maintains that he is currently a director of GBD. Reply to Counterclaim, ¶ ¶ 7-8 [Dkt. No. 18].

Ben-Dor and Lorbert acknowledge that, in July 2003, discussions occurred about ending their business relationships.  The parties dispute, however, the outcomes of those discussions.  According to Ben-Dor, the parties agreed, by July 30, 2003, to end GBD and work towards resolving the details concerning the dissolution, and, in the meantime, both parties would be free to "pursue the development of whatever new medical construction business each chose to start." Ben-Dor Rule 56(a) Statement, ¶ 7 [Dkt. No. 33].   According to Ben-Dor, they also "agreed to share information on any references until they agreed on the specific terms of the separation/dissolution."  Id.

Lorbert disagrees with this assessment of the parties' July 2003 discussions.

Lorbert maintains that while there were discussions about dissolving GBD, there was no agreement to dissolve the company before all of the terms had been negotiated and accepted by both parties. Lorbert further maintains that GBD is an ongoing business concern. Lorbert Rule 56(b) Statement, ¶ 6. Lorbert agrees that there was an interim agreement but that it only freed the parties to pursue work with new customers "who were unrelated to prior work of GBD." Id. at ¶ 7. Confirming Lorbert's account of the discussion, on July 30, Lorbert emailed Ben-Dor, writing in part:

> [t]his is to confirm our recent conversations about the business. We discussed terminating GBD, Inc. and separately pursuing new business opportunities in the medical construction field. The agreement I proposed to begin the process was that we each begin to develop our own new customer base as of August 1. We would agree to continue to share information fully regarding any customers, referrals, or leads associates with GBD prior to August 1 until we are able to finalize an termination agreement.

GBD Reply to Motion for Summary Judgment ("GBD Reply"), Ex. 10 [Dkt. No. 49].

Much of the defendants' claims are premised on a particular project that Ben-Dor undertook after August 2003 for a Dr. Rafla. The defendants argue that Dr. Rafla was previously a customer of GBD, and, therefore, neither he nor Ben-Dor could do work for Dr. Rafla individually as his account was an asset of GBD's. The defendants also argue that the work that Ben-Dor did for Dr. Rafla was essentially a project that had been contemplated and begun prior to August 1, 2003, albeit at a different location, and thus belonged to GBD and not Ben-Dor. In addition, Lorbert and GBD claim that Ben-Dor began his work for Dr. Rafla prior to the formation of the July 30, 2003 interim agreement. Ben-Dor argues that the work he did for Dr. Rafla was not precluded by the July interim agreement, that he fulfilled whatever fiduciary and contractual duties that

3

he may have had to Lorbert and GBD by disclosing to Lorbert the opportunity to work for Dr. Rafla, and that the project that he did that was associated with Dr. Rafla was independent and different from the project that had been contemplated, but never completed, for Dr. Rafla by GBD.

A series of emails between Ben-Dor and Lorbert illustrates well the disagreement between the parties. On August 20, 2003, Ben-Dor emailed Lorbert, stating that he had met with Dr. Rafla and that he requested a proposal for a project, which Ben-Dor was planning to pursue "based on our recent understanding." GBD Reply, Ex. 11. In the same email, Ben-Dor included Dr. Rafla's contact information and requested Lorbert's contact information so that Ben-Dor could "provide it to potential customers approaching me in the interim period." Id. In his August 21, 2003 response, Lorbert wrote that he was "disturbed" to learn that Ben-Dor would be working for Dr. Rafla as Dr. Rafla was an existing GBD customer and thus the relationship with him was an asset of GBD. Id. Lorbert wrote, in part: "So long as GBD is in existence, or until we reach a written termination agreement, you must understand that any new business that you may pursue that is any way connected with an existing GBD customer or GBD relationship belongs to GBD." Id. Ben-Dor responded on August 22, 2003, claiming that he was only executing his understanding of the interim agreement and that the Dr. Rafla opportunity was "not derived from a customer of GBD." Id.

Prior to August 1, 2003, GBD researched a construction project for Dr. Rafla that was to be built at 9920 Fourth Avenue in Brooklyn, New York. While that project was never completed, Ben-Dor, through his new company, completed a project on Fifth Avenue in Brooklyn. Lorbert and GBD, on the basis of documentary evidence such as

spreadsheet cost comparisons of the two projects, claim that the completed project was essentially the same business opportunity as the GBD Fourth Avenue project. Ben-Dor claims that the Fifth Avenue project was separate from the Fourth Avenue project and was not completed for Dr. Rafla but, instead, M-Leros, a group with which Dr. Rafla is merely associated. Both parties agree that this was the only project that Ben-Dor's business has done since he and Lorbert separated.

In addition to the Rafla project, Lorbert and GBD support their counterclaims for misappropriation with evidence that Ben-Dor continued to use the "GBD" name in conducting business after asserting that he was independent of GBD. Lorbert and GBD point to a GBD fax cover sheet to Dr. Rafla on September 2, 2003, a January 6, 2004 letter from Ben-Dor to an acknowledged GBD customer offering to do more work for it that does not disclose the dissolution of GBD, the use of the GBD post office box, the use of a GBD fax cover sheet on February 14, 2004 in an effort to secure credit, and a February 11, 2004 letter from Dr. Rafla to Ben-Dor that identifies Ben-Dor as being associated with GBD. GBD Reply, Exs. 6, 12-14, 16. Ben-Dor argues that the fax cover sheets are not credible because the date on them lists the date that the document was printed, not the day it was sent.

The parties agree that Ben-Dor caused GBD to pay the law firm that represents him in this litigation, used GBD funds to make an interest-free loan to a third party, and paid a "commission" to an electronics store in return for its business. While Lorbert believes that these actions are evidence of the misuse of GBD's funds, Ben-Dor maintains that these actions were proper and non-actionable. In addition, Lorbert and GBD claim that Ben-Dor fraudulently attempted to wire money from GBD to his

personal bank account after being informed, in November 2003, that a "Special Meeting of the Board of Directors of GBD" (presumably Lorbert by himself, since he maintains that he was the sole director of GBD), adopted a resolution removing Ben-Dor as the President of GBD and as a signatory on the corporate bank accounts.  GBD Reply, Ex. 17.

Ben-Dor filed suit to dissolve GBD in Connecticut Superior Court, Judicial District of Hartford, on October 23, 2003, and the action was removed by the defendants to this court on November 14, 2003.  Lorbert and GBD filed their answers and counterclaims on January 22, 2004 and June 10, 2004, respectively, stating claims for breach of fiduciary duty, misappropriation of corporate assets, unjust enrichment, intentional interference with business relations, and fraud, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. §§ 42-100a et seq.[2]  Ben-Dor has now moved for summary judgment on the defendants' counterclaims, arguing that there is no genuine issue as to any material fact and that defendants can not make an evidentiary showing sufficient to establish their claims.

## II.   LEGAL STANDARD

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Hermes Int'l v. Lederer de Paris Fifth Ave, Inc., 219 F.3d 104, 107 (2d Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists.

---

[2] The fraud claim is only asserted by GBD, not Lorbert.

Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)).  When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a Summary Judgment Motion." Lipton v. The Nature Company, 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).  Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings.  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the Summary Judgment Motion are not credible).

### III. Discussion

As the facts clearly indicate, there is a genuine dispute as to at least two material facts: whether Lorbert and Ben-Dor agreed to dissolve GBD in July 2002 and came to a meeting of the minds on an interim agreement, and whether the work that Ben-Dor did for Dr. Rafla constituted a corporate opportunity that belonged to GBD.  There is also dispute as to the significance and propriety of Ben-Dor's use of GBD funds and

corporate name. Thus, summary judgment on the basis that no genuine issue of material fact exists is inappropriate. The court will consider in turn whether the evidence presented by the defendants, if credited by a fact finder, sufficiently establish their claims.

### A. Breach of Fiduciary Duty

Lorbert and GBD argue that Ben-Dor breached his fiduciary duty to GBD when, as president of GBD, he usurped a corporate opportunity belonging to GBD for himself, namely the project that he completed for Dr. Rafla on Fifth Avenue in Brooklyn, NY.

"In Connecticut, as elsewhere, '[a]n officer and director occupies a fiduciary relationship to the corporation and its stockholders.'" Chanoff v. U.S. Surgical Corp., 857 F.Supp. 1011, 1020 (D.Conn. 1994)(quoting Pacelli Bros. Transp., Inc. v. Pacelli, 189 Conn. 401, 407 (Conn. 1983)). A complainant "bears the burden of establishing: (1) a fiduciary relationship between the corporation and the alleged wrongdoers; and (2) the existence of a corporate opportunity." Ostrowski v. Avery, 243 Conn. 355, 362 (Conn. 1997) If these predicates are established, "the burden then shifts to the fiduciaries to establish, by clear and convincing evidence, the fairness of their dealings with the corporation." Id. Whether a corporate opportunity exists is a "factual question to be decided by reasonable inferences from objective facts . . . the dominant inquiry is whether the corporate opportunity at issue falls within the corporation's avowed business purpose." Id. at 365.

On the defendant's version of the facts, there was never an actual dissolution of GBD, and Ben-Dor continued in the role of president of GBD until the "board of directors" (i.e. Lorbert) removed him from that role in November 2003. Thus, the

8

defendants have shown, on their facts, that a fiduciary relationship existed between Ben-Dor and GBD. The Fifth Avenue project for Dr. Rafla would appear to be within the avowed business purpose of GBD, and Ben-Dor does not argue otherwise. Thus, the burden shifts to Ben-Dor to demonstrate fair dealing.

Ben-Dor argues that the fiduciary duty claim against him must fail because his August 20, 2003 email constituted an adequate disclosure of the corporate opportunity, and GBD's subsequent failure to pursue the corporate opportunity for itself acts as a bar against the fiduciary duty claim. See Ostrowski, 243 Conn. at 376 (holding that adequate disclosure of a corporate opportunity is an absolute defense to usurpation of a corporate opportunity by a fiduciary). As to the meaning of "adequate disclosure," the Ostrowski court analogized to its case law on self-dealing transactions and noted that it has held that "a director may avail himself or herself of the defense of full disclosure only upon proving approval of the contract or transaction by shareholders or disinterested directors." Id. at 369 (internal quotation omitted). It also quoted a treatise for the proposition that "if the opportunity is rejected by the corporation, at least by a disinterested vote of the board of directors after full disclosure, the opportunity usually ceases to be a corporate opportunity." Id. at 371 (quoting H. Henn & J. Alexander, Laws of Corporations § 237 (3d Ed. 1983)).

The August 20, 2003 email no doubt gave Lorbert and GBD notice of a potential business opportunity with Dr. Rafla. On August 22, 2003, however, Ben-Dor emailed Lorbert again, stating in part: "You must understand that I am committed to pursuing these business opportunities in conformity with our understanding . . . . Be assured . . . that I plan to pursue all opportunities." GBD Reply, Ex. 11. Ben-Dor's second email

9

supports the inference that, regardless of what decision concerning the Dr. Rafla project that Lorbert and GBD undertook, Ben-Dor planned on pursuing the opportunity on his own.  Thus, drawing all reasonable inferences in favor of the defendants, Ben-Dor has not conclusively established that he made an "adequate disclosure" of the corporate opportunity presented by Dr. Rafla as required by Ostrowski so as to extinguish the defendants' fiduciary duty claims against him.[3]

### B.  Misappropriation of Corporate Assets

The defendants claim that Ben-Dor has misappropriated the corporate assets of GBD, including the "customer lists, information, and goodwill" of GBD.  Answer and Affirmative Defenses of Defendant GBD, ¶ 34 [Dkt. No. 25].  This claim, presumably also premised on the plaintiff's fiduciary duties to GBD, is sufficiently supported by the evidence of Ben-Dor's use of GBD's name and financial assets for his own benefit, as well as by the possible usurpation of a corporate opportunity.  See Sheehy v. Barry, 87 Conn. 656 (1914)("Since the officers of a corporation are trustees, a court of general equitable jurisdiction would at the instance of any stockholder prevent a willful misappropriation of its funds and a waste of its assets. . . .").[4]

---

[3] In his August 22, 2003 email, Ben-Dor also informs Lorbert that GBD would be unqualified for the Rafla project given GBD's inability to obtain worker's compensation insurance in New York. GBD Reply, Ex. 11.  That GBD was potentially unable to exploit this opportunity may provide a defense to Ben-Dor, in addition to the disclosure defense, that he did have a duty to disclose the opportunity to GBD.   This defense was not made an issue in the summary judgment pleadings, however.

[4] In GBD's reply to the plaintiff's motion for summary judgment, the defendants attempt to convert the claims stated in their counterclaim complaints for misappropriation (as well as fraud) into claims for theft under Conn.Gen.Stat. § 52-564, which provides for treble damages.  However, as this claim was not plead in their answers and counterclaim complaints, it cannot be amended to the defendants' claims here. See Alaimo v. Royer,188

### C. Unjust Enrichment

Given their claims for the misappropriation of assets, the defendants have sufficiently stated a claim for unjust enrichment against Ben-Dor. "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." Gagne v. Vaccaro, 255 Conn. 390, 408 (2001) (quoting Franks v. Lockwood, 146 Conn. 273, 278, 150 A.2d 215 (1959)). The elements of the claim are that "(1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment." Kull v. Davidoff of Geneva, No. 01-CIV-4821, 2004 WL 1418088, at 15 (S.D.N.Y. June 23, 2004)(citing Gagne, 255 Conn. at 409). The defendants' evidence, before the court, that Ben-Dor usurped a corporate opportunity that belonged to GBD and benefitted from it, is sufficient to create a material issue of fact requiring a jury to resolve.

### D. Fraud

GBD claims that the misappropriation of funds and corporate assets and the usurpation of a corporate opportunity also constitutes fraud on the part of Ben-Dor. "The essential elements of a cause of action in fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other

---

Conn. 36 (1986)(holding remedy of treble damages was not available in fraud action where complaint failed to expressly invoke § 52-564).

party did so act upon that false representation to his injury." Wallenta v. Moscowitz, 81 Conn.App. 213, 219 (Conn.App. 2004).  The intentional withholding of information for the purpose of inducing action can constitute fraudulent misrepresentation.  Pacelli Bros. Transp., Inc. v. Pacelli, 189 Conn. 401, 407 (Conn. 1983).

In Pacelli, the defendant, who was the president and director of a close corporation, was found to be liable for fraud, in light of his fiduciary duties to the corporation, for failing to disclose the existence of a separate bank account to the corporation.  Id. at 329.  The court in Pacelli also found that the defendant's duty to make disclosures to the corporation continued for a time after his formal fiduciary duty existed, noting that "[i]t is the duty of a director . . . to made [sic] a full and frank disclosure." Id.

In light of the fiduciary duties that, on the defendants' version of the facts, Ben-Dor owed to GBD, Ben-Dor's non-disclosures concerning his use of GBD funds and the Dr. Rafla opportunity, can constitute fraudulent misrepresentations.  GBD claims that Ben-Dor undertook his efforts to dissolve GBD with the intention of pursuing work on Dr. Rafla on his own so that he would not have to share his profits with GBD or Lorbert.  While the defendants have not presented direct evidence of wrongful intent on Ben-Dor's part, and while Ben-Dor insists that his actions were all taken in good faith, the defendants argue that Ben-Dor's claim in the August 30, 2002 email of an agreement dissolving the company, and Ben-Dor's withholding in discovery of documents related to work for Dr. Rafla, are circumstantial evidence of Ben-Dor's attempt to defraud Lorbert and GBD by dissolving GBD so that he could pursue the opportunity to work for Dr. Rafla alone.  Accordingly, the evidence in the record sufficiently supports GBD's

12

claim of fraud based on Ben-Dor's alleged non-disclosures and misappropriations for this claim to go to a jury.[5]

### E. Intentional Interference with Business Relations

Under Connecticut Law, "[t]he elements of tortious interference are the existence of a contractual or beneficial relationship, the defendants' knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff." Id. at *20 (quoting Hart, Nininger & Campbell Assoc., Inc. v. Rogers, 16 Conn.App. 619, 629(Conn. App.1988)) A defendant may be held liable if "he was not acting legitimately within the scope of his duties, but was using corporate power improperly for his personal gain." Id. (citing Murray v. Bridgeport Hosp., 40 Conn.Supp. 56, 60-61, (Conn.Super.Ct.1984)).  The claim "requires some showing of improper means or motive";  the defendants must show that the plaintiff's actions "involved fraud, misrepresentation, intimidation, or molestation, or that he acted maliciously." Id. (citing Metro. Entm't Co. v. Koplik, 20 F.Supp.2d 354, 361 (D.Conn. 1998); Weiss v. Wiederlight, 208 Conn. 525, 536 (1988)).

The defendants claim that Ben-Dor intentionally interfered with business relationships by 1) causing GBD's bank to "freeze" the GBD accounts and attempting to transfer funds from the GBD accounts to his personal accounts, thereby preventing GBD from conducting business, and 2) by informing third parties that GBD was no longer in business, thereby diverting business to his own benefit.  In GBD's reply to the motion for summary judgment, the defendants also argue that Ben-Dor interfered with

---

[5]However, for the reasons stated in footnote four, treble damages are not available to GBD under Conn.Gen.Stat. § 52-564.

13

business relationships by usurping the opportunity to work with Dr. Rafla, and by using GBD's name and the work GBD had done in furtherance of the Fourth Avenue project to secure the work with Dr. Rafla for himself.

In <u>Automatic Business Products Co. v. Hankinson</u>, No. 47066, 1992 WL 117777, *5 (Conn.Super. May 19, 1992), the court found that the plaintiff had stated a claim for the intentional interference with business relationships where the plaintiff alleged that the defendant intentionally and maliciously concealed a corporate opportunity from the plaintiff.  Similarly, here, in furtherance of their fraud claim, Lorbert and GBD accuse Ben-Dor of intentionally causing the dissolution of GBD so that he could pursue the Dr. Rafla opportunity on his own.  As discussed above, the evidence presented by the defendants circumstantially supports an inference of fraudulent intent.  See <u>Dacourt Group, Inc. v. Babcock Industries, Inc.</u>, 747 F.Supp. 157, 161(D.Conn.1990)("Whether the defendants engaged in wrongful conduct to interfere with corporate business opportunities . . . involves questions of disputed material fact which are best left for the trier of fact to resolve.")

### F. CUTPA Violation

Conn.Gen.Stat. § 42110b provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn.Gen.Stat. § 42-110b.  To determine whether an unfair practice violates CUTPA, courts examine these factors:  "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other

established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." Sanghavi v. Paul Revere Life Ins. Co., 214 Conn. 303, 311-312 (Conn.1990)(citations omitted).  A competitor or other business person can maintain a CUTPA action without showing consumer injury, although he must still demonstrate substantial injury. McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 566-67, 570 (1985).

The Connecticut Supreme Court has held that the standard for liability under a CUTPA claim is less stringent than an intentional interference with business relations claim.  Sportsmen's Boating Corp. v. Hensley, 192 Conn. 747, 756-757 (Conn.,1984)("[I]t is difficult to conceive of a situation where tortious interference would be found but a CUTPA violation would not.").   The defendants have sufficiently produced evidence supporting a claim for intentional interference with business relations, as well as for a claim of fraud, and thus have demonstrated an unfair trade practice that could support a CUTPA claim.  Therefore, Ben-Dor's motion is denied as to the defendants' CUTPA claim.

**G. Lorbert's Standing**

Ben-Dor, in his reply to Lorbert's counterclaim, raises as a defense the argument that Lorbert, as a shareholder of GBD, cannot personally state the claims discussed above.  In Yanow v. Teal Industries, 178 Conn. 262, 281 (1979), the Connecticut Supreme Court held that, while the general rule is that shareholders cannot individually sue officers of a company directly, there is a "well-settled" exception "if the injury is one to the plaintiff as a stockholder, and to him individually, and not to the corporation, as where an alleged fraud perpetrated by the corporation has affected the plaintiff directly .

15

. . ." Yanow v. Teal Industries, Inc., 178 Conn. 262, 281-282 (Conn.1979).  The Yanow court held that the exception applies where a controlling stockholder seeks to injure the minority stockholder "through the means of looting the corporation or so wrecking it that the minority stockholder would get nothing out of his assets" or where "an injury sustained to a shareholder's stock is peculiar to him alone, and does not fall alike upon other stockholders." Id. at  282 n.9.  The court agrees with Lorbert that the exception discussed in Yanow applies here and that his personal counterclaims against Ben-Dor are not barred.

**IV.    CONCLUSION**

For the foregoing reasons, the plaintiff's Summary Judgment Motion [Dkt. No. 31] is DENIED.

**SO ORDERED.**

Dated this 28th day of September, 2005, at Bridgeport, Connecticut.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge